THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LEANDER WILLIAM FABER, Appellant.

Third Department, July 11, 1939.

*Callaghan, Stout & Nova* [*Stephen Callaghan* and *Ralph Stout* of counsel], for the appellant.

*Charles P. Sullivan, District Attorney* [*John H. W. Krogmann, Assistant District Attorney*, of counsel], for the respondent.

HILL, P. J. Defendant has been found guilty of perjury first degree in the Queens County Court. His appeal has been certified to this Department by the Appellate Division, Second Department. (See 256 App. Div. 1088.) The indictment contains three counts. Each charges perjury in connection with the oath of verification of his account as receiver of the rents from premises under foreclosure. The first involves the account in an action brought by the Title Guarantee and Trust Company to foreclose upon property owned by the Fairview Holding Corporation, wherein it appeared that on October 31, 1935, he had a balance of $19,668.59, and it was charged in the indictment that his oath thereto was false for the reason that he did not have a balance of that amount " or any sum within a reasonably close approximation thereto." The second charged the filing of a like perjured statement and account as receiver in an action brought by the same plaintiff against Sohl and others, wherein it appeared that on October 31, 1935, he had a balance of $2,518.17 in his hands. The third charged perjury in connection with a like account filed on April 30, 1936, in an action brought by the same plaintiff against Bar Lellan Realty Corporation, in which a balance of $17,610.35 was falsely shown.

The basis of this criminal prosecution is the unlawful conversion of the funds of the receivership by defendant or with his knowledge by one Boehle, with whom he was engaged in the real estate business and who had charge of the collections. Boehle is a confessed thief, who admitted on the trial that his peculations may have amounted to $50,000 from these and other receiverships in which defendant or Boehle were receivers. It is unquestioned that the funds were stolen; that the statements as to the balances on hand were false. Defendant says that he had confidence in Boehle and no knowledge of the peculations. It is unquestioned that the receiver's accounts were prepared by clerical employees from figures furnished by Boehle. Defendant says that when he verified them he believed they were true and correct. Boehle testifies that defendant took moneys for his personal use from receivership funds. Defendant admits that he had a general receivership account in the Bank of Manhattan in which funds were deposited and from which there were withdrawals in connection with several receiverships, and that thereby the moneys of one receivership might have been used to pay the taxes on, and for the operating expenses of, other properties, but he says in substance that this was not an intentional evasion of the law or of the order appointing him.

There was other evidence tending to connect defendant with the shortage and larceny, also to exculpate him, including testimony given by a witness that Boehle admitted his own guilt and said that defendant had no knowledge that any money had been stolen. Enough of the facts have been given above as a background to permit an understanding of appellant's contention as to errors upon the trial.

The reversal and dismissal of the indictment is asked because it seems that there is no requirement in the statute that the accounts be verified by the oath of the receiver, and, therefore, it is argued, that the instruments upon which the charges rest are surplusage, and that the oaths were not taken as to material matters in or in connection with an action or special proceeding as is necessary to sustain a charge of first degree perjury. (Penal Law, § 1620-a.) The correctness of these accounts was a material and competent question in the receivership accounting proceedings (*People* v. *Teal*, 196 N. Y. 372) and a false oath of verification would support a charge of perjury. The other objection to the legality of the indictment concerns the form of the verification. It is conceded by the People, and the trial court ruled, that the only portion which would sustain the indictment appears in the final paragraph, in the following words: " That he [defendant] does not know of any error or omission in the * * * account, to the prejudice of any of the parties interested in the funds or in the cause." Each account stated that there was a given balance of cash in the hands of the receiver. If this was not true, the error and omission to tell the truth concerning the disposal of the money which had been converted and a false statement as to the balance on hand would prejudice the parties interested. Defendant would not be criminally liable, however, unless he knew the statement to be false or had reasonable grounds so to believe and did not make reasonable inquiry as to the truth or falsity of the account.

Prejudicial errors on the trial are asserted by defendant: After the orders appointing defendant to the three receiverships each containing a direction that the moneys be deposited in a named depository, had been received in evidence, also copies of the orders requiring the defendant to file an account, proof was given by clerks from these banks that in two instances the balances to the credit of the defendant as receiver were markedly less than shown on the account filed in court, and in one instance that no account had been opened in the designated bank. (It is claimed that the funds from the latter were deposited in the general receivership account.) The attorneys who prepared the accounts, before one

of whom the defendant took the oath to the verification, were called and stated that Boehle furnished all the figures. Boehle, the confessed thief, was called to the stand. He stated concerning the promise under which he gave his testimony, " The only promise I have received from Mr. Shapiro [trial counsel for the People] was if I told the truth in this case that if I be guilty in my own case he would recommend leniency to the Court for what help I have given." He further stated that the money collected was placed in envelopes in the safe in the office, and further, " Q. Now, what happened with this money that was in the envelopes? Did it always go to the bank intact? A. I couldn't answer that counsellor. I don't believe it did. Q. Well, did you have any conversation about it? A. No. Q. Did you ever see anybody take any money from the envelopes? A. Oh, yes, there was occasionally — [discussion between court and counsel]. Q. Whom did you see take money from the envelopes? A. Faber would borrow some money occasionally. Q. Anybody else? A. I might borrow some. Q. You mean you would take some? A. Yes. * * * Q. How long did this practice continue of taking this money out of the envelope or if you please borrowing it without putting in a receipt in the envelope? A. I couldn't answer that when it started or how long it continued. Q. Over what period of time, approximately? A. Probably before 1932. Q. And did it continue right on during this period when you and Faber were associated together? A. I believe it did."

The People sought to question Boehle concerning irregularities in connection with defendant's accounts in receiverships not involved in the indictment. An objection thereto was sustained. A lengthy colloquy ensued between the court and counsel in the absence of the jury. The result is epitomized in this statement: " By Mr. Shapiro: If from time to time the defendant Faber took money out of this account we have the right to show it because if he took it out and didn't put it back he knew there was something missing." The following is a portion of the court's reply and ruling: " That would be nice on rebuttal; it would be proper in rebuttal; we have the fact he was the receiver; we have the fact he said he had $2,500 in the bank on a certain date which he didn't have; and that he had $264.30 at a time when he said he had $2,567. Now, that is all you need; it was gotten out somehow." To this the district attorney replied, " So that I may properly understand it, does Your Honor rule with reference to the three counts that by showing the status of the account, and when I say account I mean the bank account, and the filing of the receivership that we have

made out enough to go to the jury? By the Court: Yes, I say that." The jury were returned into the court and the district attorney stated, " In view of the discussion had in the absence of the jury, the People move to strike out the entire testimony of the witness Boehle, and I respectfully ask Your Honor to instruct the jury to disregard it." This motion was granted after the court had addressed an inquiry to counsel for the defendant and had received a reply which I will later discuss. The judge admonished the jury, " that you shall disregard and drop from your minds, fail to remember, pay no attention, completely disregard the testimony of Boehle up to this point; forget that he was ever on the stand." Thereupon the People rested. In view of matters which later transpired in the trial, it will serve little more than an academic purpose to comment upon the ruling announced by the court. The People had shown defendant's appointment, the order that he account, that he had verified the accounts made up from figures furnished by Boehle which stated that he had cash balances on hand (the accounts contained no statement that the money was in the banks), and that these balances were not in the banks named as depositories. There was proof of no other facts, with Boehle's evidence stricken out. A defendant in a criminal action is not required to interpose a defense, he is presumed to be innocent until the contrary is proved. Proof that the cash balances shown in the accounts were not on deposit in the named banks fell short of establishing larceny or perjury, for the cash might have been at defendant's office or in another bank, which possibly would have subjected him to discipline for contempt of court but would not have made him guilty of perjury. When the People first rested, defendant's guilt had not been established beyond a reasonable doubt, and had the trial then ended the defendant should have been discharged.

Before the judge ruled on the People's motion to strike out Boehle's testimony, he inquired of defendant's counsel, " Have you any objection to that," and received replies, " By Mr. Callaghan: Will Your Honor let me confer for a moment with my associate (Mr. Callaghan confers with Mr. Gaffney). By Mr. Callaghan: I have no objection to that." After the motion was granted and the jury admonished to disregard Boehle's testimony as earlier detailed, and the People had rested their case, the following occurred: " By Mr. Callaghan: Now, if the Court please, in view of the fact that the People have called a witness here who has given certain testimony involving the defendant, and further in view of the fact that although Your Honor has with great pains warned the jury to say nothing about this, there is nevertheless

left in the minds of the jury the testimony given by this witness which it is impossible for them to separate and disregard; I now move for a mistrial and I move for the withdrawal of a juror. By the Court: Well, counsel for the defense having stated there was no objection to striking out this testimony from the record, if there had been the slightest objection I would have permitted it to stand. And if the objection is taken now in the form it is I will change my direction and permit the jury to consider all of it. If this motion is pressed I will restore all that testimony to the case and deny the motion for a mistrial." There followed a discussion between the court and the district attorney, impugning somewhat the good faith of defendant's counsel, following which I quote again in part from the record. " By Mr. Callaghan: I shall not withdraw the motion. By the Court: I will make this statement. In view of the fact that counsel for the defense only a few moments ago consented or stated there was no objection to striking from the record the Boehle testimony, and I relied on that, and I then made my ruling and directed the jury to disregard that testimony, now in view of the fact that counsel for the defense in their wisdom have made this motion for a mistrial, I will now change my ruling and permit the jury to consider all the testimony of Boehle up to this point, and direct that Boehle be recalled to the stand and counsel for the defense may cross-examine him, and I will permit now and direct Mr. Boehle to return to the stand and counsel may use their judgment, counsel for the defense may use their judgment in determining whether they will cross-examine him or not, and the motion for the mistrial is denied with exception to the defendant. Mr. Boehle, will you return to the witness stand." This was followed by a discussion of and an objection to the reopening of the People's case, during which the court made the following statements: " The Court of its own motion will direct that the People's case be reopened at this time solely to give the defendant an opportunity to cross-examine Mr. Boehle, if the defense wishes to; that is the only purpose I am directing its reopening at this time," also, " Cross-examination will be limited positively and definitely to matters brought out up to this time. Any other matters which may be elicited will be considered and I will direct the witness for that purpose will be the witness for the defense." Defendant's counsel argue that the statement made to the court that they did not object to the striking out of the Boehle testimony is entirely different from the imputation of the court and the district attorney that the striking out was consented to, their position being that although they did not object to the district attorney's motion to

have the evidence stricken from the record, they did not waive or forego the benefit of an exception or estop themselves from making any motion which they might be advised concerning the effect upon the jury of this testimony which the district attorney had first introduced and then moved to strike out. The court permitted the defendant to cross-examine Boehle concerning the transactions of the receivership, but curtailed any effort to show his profligate life and extravagant expenditures, ruling that such questions constituted a direct examination by the defendant. I quote from the record: " Q. How much did you take from the receiverships where you were appointed receiver? A. I couldn't answer that. Q. Was it as much as $50,000? A. I couldn't answer that. Q. You mean you don't know how much it was? A. Correct. Q. Were you spending a great deal of money in 1934, 1935 and 1936? A. No. Q. What? A. No. Q. Were you running any race horses on a race track? A. I was. Q. How many? A. When. Q. We will say in 1936? A. 1936; I had two horses. Q. In 1935 how many did you have? A. Well, four or five. Q. 1934? A. I couldn't tell you the exact amount. Q. 1933? A. One or two probably; maybe three. Q. Were you successful in the running of those horses, a success in the making or not making of money? By Mr. Shapiro: Objected to, if the Court please as not proper cross-examination. By the Court: This is direct examination. By Mr. Callaghan: All this is direct examination? By the Court: Yes. By Mr. Callaghan: Of course, Your Honor, I am not finding any fault with Your Honor's ruling, but I am sure you will pardon me when I say I am only offering this on the matter of credibility. They have brought the man here and they have vouched for him and I except to Your Honor telling this jury that this is my witness. By the Court: All right; I have ruled this is new matter; this is matter from a witness for the defendant; it is not cross-examination of any testimony in the case in chief developed up to the time the witness was excused." Exceptions were taken. " Q. Now, Mr. Boehle, you had a yacht sometime in 1935 or 1936, didn't you? A. I did."

To this line of testimony the district attorney objected and the court again stated, " He is their witness," to which an exception was taken. To the inquiry as to whether the witness lost money by betting on race horses, again the same ruling was made and the court stated to the district attorney that he might cross-examine thereon. I quote from another part of the record: " Q. How long have you been married? A. About eighteen years. Q. What

is the name of your wife? A. Mary. Q. Do you know a woman by the name of Jo Boehle? "

This was not permitted by the court even under his assumption that the witness was called in chief by the defendant. An objection was likewise sustained to questions as to whether money had been expended by the witness in connection with his amours. There were numerous rulings of this character. The index in the printed record shows that after the transaction in connection with striking out Boehle's evidence, which I have detailed, defendant's counsel conducted the direct examination and the district attorney the cross-examination. The headings of fifty-four printed pages of the record state that the district attorney was conducting a cross-examination of Boehle. He was permitted to question concerning Boehle's beliefs and conclusions, while defendant's counsel was limited strictly to direct examination.

Boehle admits that he stole money from the receivership accounts of which he was the receiver, and from those of which defendant was the receiver. He was faithless to the court which intrusted these matters to him; to his friend and associate who trusted him. Even under the court's curtailment, his cross-examination (called a direct examination) by defendant's counsel shows that the money he stole was used to support race horses and a yacht, for gambling and the maintenance of the demimonde. A man who would steal trust funds to be used for such vain, useless and immoral purposes would hardly hesitate as to the things he would say upon the witness stand under the promise of the district attorney that he would recommend leniency for the help received on the Faber trial. Under these circumstances, counsel for defendant should have been given the widest latitude on cross-examination; instead he was unreasonably limited. This, accompanied by the so-called direct examination permitted the district attorney, was so prejudicial that a new trial should be granted.

The judgment of conviction should be reversed on the law and facts, and a new trial granted.

CRAPSER, BLISS and HEFFERNAN, JJ., concur.

Judgment of conviction reversed on the law and facts, and a new trial granted.